**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW MURRAY, PETER MURRAY, TIM CHAPMAN, RUAN GOUWS, HUGH BARRON, RAYMOND OWEN, MORNE VIVIERS, DORIN BUTNARIU, and ANDRE MARNEWECK, individually and on behalf of all similarly situated persons, | ) ) ) ) ) ) ) ) ) ) | Case 2:10-cv-00103-RRE-KKK |
| Plaintiffs | ) | **MEMORANDUM IN SUPPORTOF** |
| vs. | ) ) | **PLAINTIFFS' MOTION FOR** |
| | ) | **CERTIFICATION OF RULE 23** |
| ALTENDORF TRANSPORT, INC. | ) | **CLASS ACTION** |
| d.b.a. | ) | |
| Altendorf Harvesting | ) | |
| and | ) | |
| JANICE MARIE ALTENDORF, | ) | |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION
OF RULE 23 CLASS ACTION**</u>

<u>**INTRODUCTION**</u>

    This is an action by nine foreign nationals employed under the federal H-2A visa

program as workers in the Defendants' custom harvesting operations, which are administered

largely out of Minto, North Dakota. The Plaintiffs contend that the Defendants violated their

rights and the rights of those similarly situated as set forth in uniform employment contracts, the

terms of which are identical for all class members and established by federal regulation.

Plaintiffs now respectfully move the Court to certify the breach of contract claim as pled in

Plaintiffs' fourth claim for relief in their Amended Complaint as a class action under Rule 23 of

the Federal Rules of Civil Procedure.[1]

---

[1] Plaintiffs also allege that the Defendants violated their rights by failing to comply with the Fair Labor Standards

## THE PROPOSED CLASSES

Plaintiffs seek to represent three distinct classes. Class I is defined as:

**All nonsupervisory workers employed by Defendants under H-2A temporary work visas at any time between October 28, 2004 and the date of judgment in this matter who worked primarily as <u>combine operators</u>.**

Class II is defined as:

**All nonsupervisory workers employed by Defendants under H-2A temporary work visas at any time between October 28, 2004 and the date of judgment in this matter who worked primarily as <u>grain cart operators</u>.**

Class III is defined as:

**All nonsupervisory workers employed by Defendants under H-2A temporary work visas at any time between October 28, 2004 and the date of judgment in this matter who worked primarily as <u>truck drivers or in any other capacity</u>, excluding grain cart operators and combine operators.**

All members of each of the three classes are covered by identical terms and conditions contained in their uniform employment contracts, which incorporate all federal, state, and local employment related laws and regulations. <u>See</u> discussion *infra*. While common issues predominate across all three classes, the issue of entitlement to overtime pay during workweeks of more than forty (40) hours per week could potentially give rise disparate defenses depending on whether an H-2A worker is a member of Class I, II, or III. Plaintiffs therefore propose the above three classes to simplify the maintenance of this class action and allow Defendants to raise such defenses on a class by class basis. Importantly, the three classes mirror Defendants' own classification of its workers into truck drivers, combine operators, and grain cart operators. <u>See, e.g.</u>, Ex. A at

---

Act ("FLSA"), 29 U.S.C. §§201-219. Pursuant to their Amended Complaint, Plaintiffs are asserting only individual claims under the FLSA, which may not be pursued as a class action under Rule 23 of the Federal Rules of Civil Procedure. <u>See</u> 29 USC § 216(b) (requiring a plaintiff to affirmatively give "consent in writing to become . . . a party" in a collective action under the FLSA). Likewise, Plaintiffs do not seek class action certification for their second and third claims for relief as pled in the Amended Complaint.

15 – 17.  (containing Defendants' employee handbook).

## **BACKGROUND**

Defendant Altendorf Transport, Inc. ( "Altendorf Harvesting") operates a custom harvesting business with its principal office in Minto, North Dakota. Ex. A at 1. Defendant Janice Marie Altendorf is the president of the "family owned and operated corporation." Ex. B at 1.

Defendants typically start the harvest "season off by traveling to Texas in mid-May[,]" and "continue to work their way north into Oklahoma, Kansas, Nebraska, Colorado, Iowa, South Dakota, North Dakota[,] and Minnesota." Id. at 2. In addition to serving these states, Defendants also "harvest in the Northwest states including Washington, Oregon[,] and Nevada." Id. Because of an apparent inability to find sufficient domestic labor for this custom harvesting operation, Defendants routinely apply for and obtain much of their workforce from foreign countries through the federal H-2A guestworker visa program. See 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Defendants have publicly stated that Altendorf Harvesting has employed "as many as 100 people from six different countries." Id. at 3.

To participate in the H–2A guestworker program, Defendants must first file a temporary labor certification application with the United States Department of Labor. See 20 C.F.R. §§ 655.122(c) (2012) (specifying minimum terms which must be contained in the job offer).[2] Defendants must also file a form "ETA 750" Application for Alien Employment Certification and a form "ETA 790" Agricultural and Food Processing Clearance Order, both of which must comply with federal regulations. See Perez-Benites v. Candy Brand, LLC, 2011 WL 1978414,

---

[2] This regulation has remained substantively unchanged during the time period relevant to the proposed classes, though it has existed in different sections of the Code throughout. See Ex. J (providing an historical overview of the mechanical changes to the Code in this regard).

*15 (W.D. Ark. 2011). <u>See also</u> 20 C.F.R. § 655.135(e).[3] "These regulations establish the minimum benefits, wages, and working conditions that must be offered to employees and form the contracts between employers and employees." <u>Perez-Benites</u>, 2011 WL 1978414 at *15 (citing <u>Arriaga v. Florida Pacific Farms, LLC</u>, 305 F.3d 1228, 1233 n.5 (11th Cir.2002)). <u>See also</u> <u>Salazar-Calderon v. Presidio Valley Farmers Ass'n</u>, 765 F.2d 1334, 1342 (5th Cir. 1985) ("[T]he terms of employment set out in DOL's H-2 regulations . . . [are] the terms […] defendants [are] required to offer unless those terms [are] waived by the" federal government.).

"To ensure that the employment of H–2A workers [does] not adversely affect the wages and working conditions of U.S. workers," Defendants are "obligated to pay the higher of the federal minimum wage, the prevailing wage, or the Adverse Effect Wage Rate ('AEWR') for each hour worked." <u>Perez-Benites</u>, 2011 WL 1978414 at *15. "Payment of the AEWR is important for many reasons, not the least of which is protection of U.S. workers from facing unfair competition if employers were permitted to undercut wages by paying foreign workers a drastically reduced wage." <u>Id.</u>

In addition to the uniform contracts' requirement "that Defendants pay the AEWR to H–2A workers, Defendants were also contractually obligated to 'comply with applicable federal, State, and local employment related laws and regulations.'" <u>Id.</u> (quoting 20 C.F.R. § 655.103(b) (2008)).[4] "The [Fair Labor Standards Act] is one such law that the H–2A contracts incorporate." <u>Id.</u> "As a result, failure to pay the federal minimum wage, in addition to being a violation of the FLSA, also constitutes a breach of the H–2A contract." <u>Id.</u> Likewise, the uniform contracts also incorporate the FLSA's guarantee of overtime pay for non-exempt employees "at a rate not less than one and one-half times the regular rate" for workweeks longer than forty hours a week. 29

---

[3] Likewise, this regulation has remained substantively unchanged.  <u>See</u> Exhibit J.
[4] <u>See</u> Ex. J (discussing the different sections of the Code which have historically contained this provision).

U.S.C. § 207.

Further, the uniform "contracts require that travel and daily subsistence costs for workers' transportation to the place of employment be reimbursed at the 50% point of the contract." Perez-Benites, 2011 WL 1978414 at *15. See also 20 CFR § 655.122(h)(1) (2008).[5] When "the worker completes the work contract period, and the worker has no immediately subsequent H-2A employment, the employer must provide or pay for the worker's transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, departed to work for the employer." 20 CFR § 655.104(h)(2) (2009).[6]

Defendant Jan Altendorf, "owner" of Altendorf Harvesting, personally executed ETA 750s and 790s on numerous occasions, thereby binding Defendants to the terms of the uniform contracts. See, e.g., Ex. E at 9 (ETA 790); Ex. E at 33 (ETA 750). In each ETA 750, Ms. Altendorf declared "under penalty of perjury" that the "job opportunity's terms, conditions and occupational environment are not contrary to Federal, State, or local law[]" and that "the wage paid to" H-2A workers "will equal or exceed the prevailing wage which is applicable at the time the alien begins work." See, e.g., Ex. E at 3; Ex. E at 34.  Likewise, Ms. Altendorf specified in the ETA 790s an hourly wage at which H-2A workers would be paid, certifying with her signature that such a "job order describes the actual terms and conditions of the employment being offered . . . and describes all the material terms and conditions of the job." Ex. F at 7; Ex. F at 10.

Identical terms within uniform contracts govern the employment relationship between Defendants and all members of each of the three proposed classes. It is to redress Defendants' breach of these uniform contracts that Plaintiffs now seek class certification.

---

[5] See Exhibit J.
[6] See Exhibit J.

## SUMMARY OF ARGUMENT

Each of the three proposed classes meet the requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Therefore, Plaintiffs Motion for Class Action Certification with regard to their claim for breach of contract should respectfully be granted.

Joinder of the numerous members Classes I, II, III, which are comprised entirely of foreign nationals residing in countries across the planet, is impracticable. Defendants' general policy of violating the standardized contracts gives rise to common questions of law and fact across all three classes. Specifically, Plaintiffs and class members commonly contend that Defendants enforced a general, unofficial policy of violating the identical, federally-imposed terms of the uniform contracts that governed their relationship with each of the class members. This common contention, itself capable of classwide resolution, gives rise to several other common questions of law and fact: Whether Defendants' enforced a policy which denied H-2A workers 1) hourly wages at the higher of the AEWR or prevailing wage; 2) overtime pay when lawfully earned; and 3) payment for travel and subsistence costs to and from their place of employment in the United States.

The claims of the named Plaintiffs, who seek to enforce the terms of their uniform contracts, are typical of the members of each of the three classes. Likewise, the named Plaintiffs will vigorously pursue the common interest of enforcing the terms of their uniform contracts through qualified class counsel.

Further, common evidence, including Defendants' employee handbook, reconciliation sheets, vendor ledgers, and other payroll documents establishes a prima facie case for breach of contract for the class, thereby demonstrating common questions of law and fact which predominate over questions affecting individual members. Finally, a class action is superior to

other methods of adjudication given the class members' locations around the world, their unfamiliarity with the American legal system, and relatively small amount of individual recovery.

Therefore, the Court should respectfully grant Plaintiffs' Motion for Class Certification and permit this matter to proceed as a class action with respect to the claim for breach of contract as set forth in Plaintiffs' Amended Complaint.

## LAW AND ARGUMENT

"To be certified as a class, plaintiffs must" first "meet all of the requirements of Rule 23(a)" of the Federal Rules of Civil Procedure.  In re St. Jude Med., Inc., 425 F.3d 1116, 1119 (8th Cir. 2005). Rule 23(a) "authorizes classes that meet requirements of numerosity, commonality, typicality, and fair and adequate representation." Luiken v. Domino's Pizza, LLC, 705 F.3d 370, 372 (8th Cir. 2013). Plaintiffs must also "satisfy one of three subsections of Rule 23(b)." St. Jude, 425 F.3d at 1119.

At the class certification stage, Plaintiffs' burden is limited to demonstrating that a proposed class satisfies the requirements of Rule 23. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). This "preliminary inquiry . . . may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." Blades v. Monsanto Co., 400 F.3d 562, 567 (8th Cir.2005). "Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." Id. "Any doubt must be resolved in favor of certification." Fielder v. Credit Acceptance Corp., 175 F.R.D. 313, 321 (W.D. Mo. 1997). "The district court is accorded broad discretion to decide whether certification is appropriate[.]" Prof'l Firefighters Ass'n of Omaha, Local 385 v.

Zalewski, 678 F.3d 640, 645 (8th Cir. 2012).

## I. A precisely defined class exists.

The three classes are precisely defined. An essential prerequisite of a class action is that there must be a class. In re A.H. Robins Co., 880 F.2d 709, 728 (4th Cir. 1989); White v. National Football League, 822 F. Supp. 1389, 1402 (D. Minn. 1993); Charles Alan Wright, et al., 7A Federal Practice & Procedure § 1760 (3d ed. 2005). In keeping with the construction of Rule 23, the class does not have to be so ascertainable that every potential member can be identified at the commencement of the action. See Doe v. Charleston Area Med. Ctr., Inc., 529 F.2d 638, 644-45 (4th Cir. 1975); Ashe v. Board of Elections, 124 F.R.D. 45, 47 (E.D.N.Y. 1989). The class description need only be sufficiently definite so that it is administratively feasible for a court to determine whether a particular individual is a member. See Wright, et al., at § 1760.

Here, the proposed classes consist of easily-distinguishable workers who were employed by Defendants in the six years prior to the commencement of this action and through its date of judgment. Because the classes are limited to those workers who were admitted to work for the Defendants pursuant to H-2A visas and further separated into specific classes based on Defendants' own descriptions of the jobs they performed, it is relatively simple to determine whether an individual is a member of the any of the three classes. Therefore, the precisely defined class requirement is met. See Haywood v. Barnes, 109 F.R.D. 568, 576 (E.D.N.C. 1986) (certifying a class action in a case of migrant workers employed by a farmer during a specific time period).

## II. The named Plaintiffs are members of the class.

Prior to analyzing a case under Rule 23(a), the Court must find that the proposed class representatives are members of the class. See East Texas Motor Freight Sys., Inc. v. Rodriguez,

431 U.S. 395, 403 (1977). A class representative must show that the threat of injury to him or her is real and immediate. See Sonsa v. Iowa, 419 U.S. 393, 402-03 (1975). If an action is brought by a number of proposed class representatives, it is only necessary that one of them be a qualified member of the class as long as the other prerequisites of Rule 23(a) are satisfied. See Hunter v. Atchison, Topeka & Santa Fe Ry. Co., 188 F.2d 294, 301 (7th Cir. 1951); Wright, et al., at §1760.

All named Plaintiffs were employed by Defendants pursuant to H-2A visas. See Ex. C at 8-9 (including named Plaintiffs Butnariu, Barron, Marneweck, Murray, A., and Murray, P. amongst the H-2A employee list for 2008); id. at 12 (noting Plaintiff Chapman as an H-2A employee in 2009); id. at 15 (demonstrating Plaintiff Owen's H-2A employment in 2009); id. at 16 (listing Plaintiff Vivier as an H-2A employee in 2009); id. at 18 (mentioning Plaintiff Gouws amongst the 2010 H-2A employees).

Likewise, all proposed classes contain more than one named Plaintiff as a member. Plaintiffs Andrew Murray and Gouws were combine operators and are therefore members of Class I;   Plaintiffs Peter Murray and Butnariu, both grain cart operators, are members of Class II; and Plaintiffs Barron, Chapman, Marneweck, and Owen, all truck drivers, and Viver, a mechanic, are members of Class III. See, e.g., Ex. D (reconciliation sheets of Plaintiffs). See also Ex. L (containing the declarations of the named Plaintiffs).

The named Plaintiffs have also detailed the Defendants' unofficial policy of violating the federally-imposed terms of the standardized contracts that governed their relationship with all class members across the classes. Ex. L (declarations).  Thus, the named Plaintiffs are members of their respective classes and have a stake in pursuing the class-based claims for violations of the uniform employment contracts.

**III. The requirements of Rule 23(a) are satisfied.**

*A. The geographically-dispersed class members are so numerous that joinder of all members is impracticable.*

Numerosity and impracticality of joinder are established in this case. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There are no arbitrary rules regarding the size of the class necessary to meet the numerosity requirement." Paxton v. Union National Bank, 688 F.2d 552, 559 (8th Cir.1982), cert. denied, 103 S.Ct. 1772 (1983). The key inquiry is not whether joinder is impossible, but instead whether joining all members of the class would be extremely difficult or inconvenient. Morgan v. United Parcel Service of America, Inc., 169 F.R.D. 349, 355 (E.D. Mo. 1996).

If a class has over 40 members, it almost always satisfies the numerosity requirements of Rule 23(a)(1). See Robinson v. Sears, Roebuck and Co., 111 F. Supp. 2d 1101, 1120 (W.D. Ark. 2000). See also Paxton, 688 F.2d at 566 (finding that a class of 53 members satisfies the numerosity requirement); Arkansas Educ. Ass'n v. Board of Educ., 446 F.2d 763, 765 (8th Cir. 1971) (affirming certification of a class of 20 individuals).

While the limited scope of precertification discovery makes it necessary to approximate the size of each of the three classes, by any measure each class is far larger than 40 and plainly meets the numerosity requirement.[7] Across all three classes, class members total approximately 420. See Ex. C. From 2008 forward, it is apparent that Defendants employed dozens of class members from each of the three classes in any given year. See Ex. C; Ex. G. When these numbers are added together, the unofficial numerosity threshold of 40 is greatly exceeded

---

[7]Through an agreement of the parties, discovery leading up to the motion to certify has been "directed towards a determination of whether Plaintiffs' non-Fair Labor Standards Act claims may be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure [. . .] with additional factual discovery conducted thereafter." Doc. 52. Accordingly, discovery was conducted for only a fraction of the workers in each of the three classes.

multiple times over.

The geographic dispersion of the class members in this case is also relevant to the numerosity analysis and confirms impracticability of joinder. See Boyd v. Ozark Air Lines, Inc., 568 F.2d 50, 55 (8th Cir. 1977). Several other courts have recognized that such geographic dispersion makes joinder of all class members extremely difficult. See, e.g., De Leon-Granados v. Eller & Sons Trees, Inc., 497 F.3d 1214 (11th Cir. 2007) (upholding class certification where class members were workers "from Guatemala, Honduras, and Mexico"); Rosiles-Perez v. Superior Forestry Service, Inc., 250 F.R.D. 332, 338-39 (M.D. Tenn. 2008) (involving guestworkers residing in several different states in Mexico). Here, the class members are temporary H-2A guestworkers who maintain their homes in foreign countries across the planet including New Zealand, Switzerland, South Africa, and Romania. See Ex. C. Moreover, these foreign nationals' unfamiliarity with the United States' legal system further adds to the extreme burden of joinder. See Leyva v. Buley, 125 F.R.D. 512, 515 (E.D. Wash. 1989) (holding that joinder of class members was extremely burdensome due to workers' lack of sophistication and limited knowledge of the American legal system).

Given the number of H-2A workers in each class and the fact that class members are geographically dispersed throughout the world, the numerosity and impracticality of joinder requirements of Rule 23(a)(1) are satisfied.

B.  *Questions of law and fact are common to the class.*

Plaintiffs and class members' common contention that Defendants operated under a general policy of violating the uniform contracts satisfies the commonality requirement of Rule 23(a)(2). This rule requires that there be common questions of law or fact among the members of the class. Paxton, 688 F.2d at 552. This rule does not require that every question of law or fact be

common to every member of the class. See Mosley v. General Motors Corp., 497 F.2d 1330, 1334 (8th Cir. 1974); Like v. Carter, 448 F.2d 798, 802 (8th Cir. 1971), cert. denied, 405 U.S. 1045 (1972). However, the claims of the class "must depend on a common contention of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2545 (2011). In this regard, "proof of commonality" may "overlap[]" with the merits of a claim. Id. at 2552.

In the context of a wage an hour case such as this one, demonstrating commonality requires plaintiffs to "show significant proof" that an employer "operated under a general policy of [violating . . . labor laws]." Wang v. Chinese Daily News, Inc., 709 F.3d 829, 834 (9th Cir. 2013) (quoting Ellis v. Costco Wholesale Corp., 657 F.3d 970 (9th Cir. 2011) (quoting Dukes, 131 S.Ct. at 2556)) (brackets in original). "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." Wang, 709 F.3d at 834 (quoting Dukes, 131 S.Ct. at 2556) (alteration and internal quotation marks omitted).

Here, the overarching "common contention" (Dukes, 131 S.Ct. at 2551) of Plaintiffs and class members is that Defendants "operated under a general policy of" violating Plaintiffs' and class members' standardized contracts, which incorporate all federal, state, and local employment laws. Wang, 709 F.3d at 834. "[D]etermination of" the "truth or falsity" of this common contention "will resolve an issue that is central to the validity of each one of the claims in one stroke[,]" namely the issue of whether Defendants breached the terms of the uniform contracts with Plaintiffs and class members, thereby giving rise to damages. Dukes, 131 S.Ct. at 2545.

Indeed, "significant proof" abounds that Defendants operated under such a policy. Dukes,

131 S.Ct. at 2556.

- *Defendants' employee handbook demonstrates that members of each class were paid a flat salary regardless of how many hours they worked.*

Defendants' own admissions, as captured in their employee handbook ("The Harvest Adventure") are significant proof of Defendants' general policy of violating class members' standardized contracts across all three classes. Ex. A at 1. In this handbook, Defendants admit, with remarkable candor, that during "The Harvest Run" Plaintiffs and class members were required to be "in the field from 8:00 AM until 11:00 PM (7 DAYS A WEEK)." Ex. A at 6 (capitalization in original). Defendants further clarify that "this is an **average**" and that "hours of work will vary with the weather."[8] Id. (emphasis added).

With regard to the manner in which their employees are paid for working, on average, 15-hours a day, 7 days a week, Defendants again are admirably frank: They "pay [an] above average rate of **salary** for [the] harvest[.]" Id. at 7 (emphasis added). While explicitly admitting that all members of each of the three classes are paid a flat-rate salary for what Defendants themselves acknowledge are, on average, 105 hour workweeks during the harvest, the handbook is also notable for what it does not say: Defendants, under the uniform contracts, are obligated "to pay the higher of the federal minimum wage, the prevailing wage, or the Adverse Effect Wage Rate ('AEWR') for each hour worked." Perez-Benites, 2011 WL 1978414 at *15. Plaintiffs and class members in all three classes commonly contend that this general policy of paying workers a flat salary regardless of the amount of hours worked resulted in their being paid less than the higher of the prevailing wage or AEWR. The "truth or falsity" of this common contention "will resolve an issue that is central to the validity of each one of the claims" –

---

[8] Even "[i]f weather does not allow cutting, there is still plenty of maintenance work[,]" including "[c]leaning up units, changing oil, and help (sic) other service up keep (sic) that needs to be caught up." Ex. A at 7 (directly quoting the employee handbook).

whether Defendants breached their contracts with Plaintiffs and class members – "in one stroke."

Dukes, 131 S.Ct. at 2545.

Moreover, the 16 page manual makes no mention of any right to overtime, which must be paid to non-exempt employees by virtue of the FLSA's incorporation into the uniform contracts. See 29 U.S.C. § 207 (guaranteeing overtime pay "at a rate not less than one and one-half times the regular rate" for workweeks longer than forty hours a week.). While Defendants will be provided with a fair opportunity to raise exemption defenses with regard to each of the three classes, their failure to account for any right to overtime in the employee handbook while acknowledging 7-day workweeks consisting of 15 hour days is significant proof a policy to deprive overtime pay to class members who have lawfully earned it. That "common question— whether the defendant had an unofficial company policy forcing plaintiffs to perform duties for which they were entitled to overtime—ha[s] a common answer capable of resolution in one stroke." Luiken, 705 F.3d at 377.

- *Defendants' payroll records do not demonstrate, or even account for, payment of the prevailing wage and overtime.*

Adding to the significant proof of Defendants' common policy of violating the uniform contracts are Defendants' own payroll records. For instance, even a cursory perusal of the so-called "reconciliation sheets" demonstrates that Defendants failed to account for, much less pay, the prevailing wage to members of the three classes when this wage was higher than the AEWR.[9] See generally Ex. G (indicating only a column for "Adverse Rate  / hour" and not even contemplating payment of the prevailing wage). Importantly, there is significant proof that the prevailing wage was higher than the AEWR at certain intervals across all three classes given that

---

[9] Plaintiffs strongly dispute that the reconciliation sheets demonstrate true and actual payment of the AEWR in instances where the AEWR was higher than the prevailing wage. This dispute largely goes to the merits, however.

the "H-2A prevailing wage determinations for North Dakota for 2008-2009" were $12.00 per hour for agricultural equipment operators and $14.00 per hour for truck drivers. Ex. H at 3. For example, William Botha, a truck driver, was alleged to have been paid the "Adverse Rate / hour" of $10.39 for work in North Dakota throughout 2009 rather than prevailing wage of $14.00 per hour. See Ex. G at 149. Similarly, Jaques De Laquera, a combine operator, was allegedly paid $10.39 per hour for work done in North Dakota rather than the $12.00 per hour prevailing wage for agricultural equipment operators. See Ex. G at 228. Grain cart operator Shaun Goosen was likewise allegedly paid $10.39 per hour for work done in North Dakota instead of the higher prevailing wage. See Ex. G at 288. Far from being an individualized inquiry, Defendants standardized payroll records represent significant proof that Defendants' operated under a general policy of violating the uniform contracts by denying Plaintiffs and class members payment of the prevailing wage when higher than the AEWR.

Defendants' payroll records, without exception, also fail to account for payment of overtime, further demonstrating Defendants' common policy of violating the uniform contracts and the employment laws they incorporate. See generally Ex. G. As with the prevailing wage, Defendants' reconciliation sheets do not even have a means by which overtime is tabulated or accounted for. See id. For instance, the reconciliation sheets of named Plaintiff Tim Chapman are just some of the many reconciliation sheets which demonstrate Defendants' common policy of violating the uniform contracts through non-payment of overtime. Taking Defendants' own tally of hours and rate of pay as stated in the reconciliation sheet as entirely true,  Chapman, a "trucker," worked 134.75 hours in a 12-day pay period from July 15 through July 26 at an alleged "Adverse Rate / hour" of $10.39. [10] Ex. G at 179. He was paid a flat rate of $1,250 for

---

[10] It is beyond reasonable dispute that a truck driver like Chapman, who is employed by a custom harvesting operation and involved in off-farm transportation of commodities, is entitled to overtime under the FLSA. See 29

this work, with no accounting or payment of overtime. Id. This is just one example of many

documented in the reconciliation sheets. See generally Ex. G. Conversely, Defendants have not

produced a solitary reconciliation sheet which shows any member of any of the three classes was

ever paid a dollar of overtime. See generally Ex. G. This constitutes significant proof that

Defendants operated under a policy of violating the uniform contracts, which incorporate the

FLSA's guarantee of overtime for non-exempt employees who work more than 40 hours a week.

29 U.S.C. § 207.

- *Defendants' payroll records and admissions from Jan Altendorf demonstrate Defendants' practice of refusing to fully reimburse transportation and subsistence costs.*

Significant proof exists that Defendants operated under a general policy of violating their

employment contracts through a practice of failing to fully reimburse Plaintiffs and class

members for transportation and subsistence costs to and from the United States. The uniform

"contracts require that travel and daily subsistence costs for workers' transportation to the place

of employment be reimbursed at the 50% point of the contract." Perez-Benites, 2011 WL

1978414 at *15. See also 20 CFR § 655.104(h)(1) (2009). When "the worker completes the work

contract period, and the worker has not immediately subsequent H-2A employment, the

employer must provide or pay for the worker's transportation and daily subsistence from the

place of employment to the place from which the worker, disregarding intervening employment,

departed to work for the employer." 20 CFR § 655.104(h)(1) (2009).

Here, the declaration and accompanying calculations of Mr. David Dunham, who worked

for Altendorf Harvesting both as an employee working in the fields and later as human resources

manager, demonstrate Defendants' practice of excluding substantial taxes and fees from class

members' reimbursement for airfare to and from the United States. See Ex. K.

C.F.R. § 780.118.

Further, it is evident that Defendants had a routine practice of not reimbursing Plaintiffs and class members for daily subsistence costs during both inbound and outbound travel, which is additional substantial proof that Defendants operated under a general policy of violating the uniform contracts. Virtually all cash disbursement ledgers which indicate payment for "travel meals" to Plaintiffs and class members clearly document only one such subsistence payment rather than the two. See, e.g., Ex. I at 28 (one payment of $39 for meals); id. at 35 (one payment of $39 for meals); id. at 40 (one payment of $39 noted as "reimburse for travel meals"); id. at 43 (one payment of $46 for meals); id. at 42 (one payment of $39 for meals). While not as financially impactful as Defendants' practice of denying Plaintiffs and class members the higher of the prevailing wage or the AEWR, it is nevertheless additional substantial proof that Defendants operated under a common policy of violating the uniform contracts.

The above significant proof that Defendants operated under a common policy of violating the terms of the uniform contracts instructively shows how the facts of this case are entirely different from Dukes, where class certification was sought against the country's "largest private employer." Dukes, 131 S. Ct. at 2546. In Dukes, the Court found an absence of commonality under Rule 23(a)(2) because allegedly discriminatory "promotion decisions" were "generally committed to local managers' broad discretion, which was exercised in a largely subjective manner." Id. (internal quotations omitted). Reasoning that plaintiffs wished "to sue about literally millions of employment decisions at once[,]" the Court found it "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question of why" any one worker was disfavored. Id. at 2552.

Here, Plaintiffs do not seek class certification for claims of discrimination against an employer of millions which stem from individual decisions regarding promotions by

geographically dispersed managers. To the contrary, Plaintiffs seek class certification for breach of a uniform contract applying to all class members, the terms of which were routinely ignored or flatly flaunted by the head of a closely-held, "family owned and operated corporation[]" as evidenced by express-written policy and centralized payroll practices. Ex. B at 1. The question of "why" Plaintiffs and class members were denied their rights or "the reason for a particular employment decision[]" is irrelevant to the inquiry. Dukes, 131 S. Ct. at 2546. Rather, the "common contention" in this case is that Defendants operated under a general policy of violating the uniform contracts. Dukes, 131 S. Ct. at 2551. When the truth or falsity of this common contention is determined, the central issue of whether Defendants breached these contracts on a classwide basis will be resolved "in one stroke." Id.

Recent case law within this circuit leaves no room for dispute as to whether such a common contention satisfies Rule 23(a)(2). Where the common question raised is whether an employer "enforced an unofficial policy of denying overtime pay[,]" or, by extension, an unofficial policy of denying payment of wages at a specific rate, commonality is met. Luiken, 705 F.3d at 377. In Luiken, a putative class of pizza delivery drivers failed to meet the commonality requirement in an action against their employer, alleging that a fixed charge paid for delivery service by customers was a gratuity wrongfully withheld from them in violation of a Minnesota state statute. Id. at 376. Finding the statute contemplated whether each specific customer had reasonably construed the delivery charge as a payment for personal services, the court reasoned that the "charge might reasonably be construed as a payment for personal services in one transaction" and may not be "reasonably . . . construed that way in another transaction." Id. Hence, "the district court . . . erred in finding commonality, because the varied circumstances of deliveries prevent 'one stroke' determination." Id.

Instructively, the court took pains to distinguish the facts of <u>Luiken</u> from cases in which "plaintiffs allege[] that" an employer "enforced an unofficial policy denying overtime pay." <u>Id.</u> at 377 (citing <u>Ross v. RBS Citizens, N.A.</u>, 667 F.3d 900, 903 (7th Cir. 2012), *vacated and remanded*, 133 S.Ct. 1722.[11] That "common question -- whether defendant had an unofficial company policy forcing plaintiffs to perform duties for which they were entitled to overtime -- had a common answer capable of resolution in one stroke." <u>Id.</u> Such is the case here. Whether Defendants had an unofficial company policy of violating the terms of the uniform contracts, including provisions requiring the payment of the higher of the AEWR or the prevailing wage and overtime when lawfully earned, is likewise the type of claim capable of one-stroke resolution.

Notably, Plaintiffs' common contention that Defendants operated under a general policy of violating the uniform contracts is also capable of being rephrased as several common questions of law and fact: Whether Defendants' enforced a policy which denied H-2A workers 1) hourly wages at the higher of the AEWR or the prevailing wage; 2) overtime pay when lawfully earned; and 3) payment for travel and subsistence costs to and from their place of employment in the United States. These common questions are also capable of one-stroke resolution, any one of which "can satisfy the commonality requirement of Rule 23(a)(2)." <u>Dukes</u>, 131 S.Ct. at 2556.

*C. Plaintiffs' claims are typical of the claims of the class.*

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Fed.R.Civ.P. 23(a)(3). Typicality is generally met "if the claims or defenses of the representatives and the members of the class stem from a single event or are

---

[11] <u>Ross</u> was recently vacated and remanded by the United States Supreme Court, but for "consideration in light of <u>Comcast Corp. v. Behrend</u>, 133 S.Ct. 1426 (2013)[,]" a case which turned on a Rule 23(b)(3) analysis. <u>Ross</u>, 133 S.Ct. 1722 (2013). <u>See also</u>  predominance discussion, *infra*. Thus, <u>Ross</u>' reasoning regarding the commonality requirements of Rule 23(a)(2) is sound.

based on the same legal or remedial theory." Paxton, 688 F.2d at 561–62 (internal citations

omitted). See also Donaldson v. Pillsbury Co., 554 F.2d 825, 831-32 (8th Cir. 1977).

      In this case, the claims of all three classes are limited to a single concern: Defendants'

general policy of violating the identical, federally-imposed terms of the uniform contracts that

governed their relationship with each and every member of every class. The claims of the named

Plaintiffs – like their uniform contracts – are identical in all relevant respects to those of the class

members. For example, if the named Plaintiffs are to succeed in their own claims with respect to

establishing Defendants' practice of failing to pay the higher of the prevailing wage or the

AEWR, they will have to establish the same factual bases and prevail on the same legal theories

that will underpin the class members' claims. Since the class-based claims in this case arise from

the same conduct and are based on the same legal theory, the typicality requirements of Rule

23(a)(3) have been satisfied. See Paxton, 688 F.2d at 561-62.

*D. Plaintiffs will fairly and adequately protect the interest of the class.*

      Plaintiffs meet the adequacy requirement of Rule 23(a)(4). This rule requires that "the

representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P.

23(a)(4). The adequacy requirement is a two-part inquiry to determine whether the class

representatives have interests in common with the rest of the class and "whether the class

representatives will vigorously prosecute the interest of the class through qualified counsel."

Paxton, 688 F.2d 562-63.

      Here, the interests of the named Plaintiffs are in no way antagonistic to those of the other

members of the proposed class. All class members will benefit from the relief sought by

receiving damages. The named Plaintiffs will not benefit in any way from actions that will prove

harmful to the interests of the members of the three classes. All Plaintiffs were H-2A workers

who were employed pursuant to uniform employment contracts identical to the contracts of the class members they seek to represent and suffered the same violations of law and breaches of those contracts as the class members. The claims are identical for all members of each of the three classes, as Defendants had an unofficial policy of not paying the higher of the AEWR or prevailing wage as well not paying overtime for work performed by non-exempt employees. The named Plaintiffs' interest in recovering damages for themselves for breach of contract is therefore the same as that of the class members. If the named Plaintiffs are unable to recover the wages they are owed under their contracts, then the class members will also be unable to recover.

In addition to the adequacy of the named Plaintiffs, they are represented by attorneys from two law firms, which are partnering to provide additional resources to vigorously litigate Plaintiffs and class members' claims. Attorney Mac Schneider practices at a law firm with experience litigating state and federal class actions. See North Dakota Human Rights Coalition v. Bertsch, 697 N.W.2d 1 (2005) (indicating attorney Mark G. Schneider as lead counsel for plaintiffs). See also Association for Retarded Citizens of North Dakota v. Olson, 713 F.2d 1384 (8th Cir. 1983) (noting Schneider, Schneider & Schneider "of counsel" attorney Mary Deutsch Schneider as attorney for appellees). Attorney Al Boucher has nearly 30 years experience litigating state and federal cases as a partner with Robert Vogel Law Office and currently serves as an affiliated faculty member at the University of North Dakota School of Law teaching civil pretrial litigation.

**IV. The requirements of Rule 23(b)(3) are satisfied.**

In order to have a class certified, the Plaintiffs must not only satisfy Rule 23(a), but must also meet one of the alternative requirements of Rule 23(b). Here, Plaintiffs' claims for monetary relief meet the requirements for certification under Rule 23(b)(3).

A.  *Common questions of law and fact predominate in this case.*

Rule 23(b)(3) requires a finding that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class." Luiken, 705 F.3d at 377. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir.2005). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010). "While limited in scope, this analysis should also be rigorous." In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 619–20 (8th Cir. 2011). However, "[t]he question at class certification is not whether the plaintiffs have already proven their claims through common evidence." Id. "Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions." Id.

Taking as true Plaintiffs' common contention that Defendants broadly enforced a policy of denying employees the benefit of their bargain under the standardized contracts, common evidence is capable of making out "the elements of a prima facie case for breach[.]" Godon v. Kindred Public School Dist., 789 N.W.2d 663, 668 (N.D. 2011). These elements are "(1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." Id.

First, that there is common evidence establishing the existence of a contract cannot be

denied. Prior to employing Plaintiffs and all class members, Defendants first had to file ETA 750 and 790 forms with the federal government. See discussion, *supra*. Together, these constitute the job offer. See Salazar-Calderon, 765 F.2d at 1342; Perez-Benites, 2011 WL 1978414 at *15. That this offer was accepted is also capable of being proved by common evidence, including, most obviously, Defendants' admission that they employed all class members. See Ex. C. Thus, the uniform contracts at issue in this case, which contain identical obligations as set forth by federal regulations, literally could not be more "common[.]" Luiken, 705 F.3d at 377.

Breach will also be established by common evidence. Prominent amongst this common evidence is the employee handbook and the policy announced by Defendants themselves that Plaintiffs and class members would be in the field for 15 hours a day, 7 days a week during the harvest while being paid an "above average rate of **salary** for [the] harvest" rather than the higher of the AEWR or the prevailing wage.  Ex. A at 7 (emphasis added). See also discussion *supra*.

The employee handbook will also be used to establish breach of Defendants' obligation to pay overtime to non-exempt employees since it entirely excludes the possibility of payment of overtime in favor of a salary for members of all three classes. Indeed, Defendants' employee manual is common evidence of a classic variety which has routinely been found to demonstrate predominance in class actions where employers have promulgated allegedly unlawful employment policies. See, e.g., In re FedEx Ground Package Sys., Inc., Employment Practices Litig., 662 F. Supp. 2d 1069, 1076 (N.D. Ind. 2009) (finding that "plaintiffs' claims ultimately could be resolved on the basis of common evidence such as the drivers' Operating Agreement with Fed Ex and commonly applicable FedEx policies."); Hernandez v. Starbucks Coffee Co., 2011 WL 2712586, at *2 (S.D. Fla. 2011) (noting defendant's concession "that common

evidence exists as to whether Starbucks store managers are exempt through job descriptions, **manuals**, partner guides, and performance evaluation forms.") (emphasis added).

Other common evidence establishing breach includes Defendants' reconciliation sheets. The reconciliation sheets, on any of their respective faces, demonstrate classwide breach by Defendants of their obligation to pay the prevailing wage when higher than the AEWR given that these documents show Defendants never even fathomed paying the prevailing wage. See discussion *supra*. For the same reason, the reconciliation sheets also indicate that Defendants never attempted to calculate overtime owed to Plaintiffs and non-exempt class members, ostensibly because they had no intent of ever paying overtime. Id. That Defendants' compensation system cannot account for Plaintiffs and class members' right to the higher of the AEWR or prevailing wage is precisely the type of common evidence that establishes predominance in a wage and hour case. See Bouaphakeo v. Tyson Foods, Inc., 564 F.Supp.2d 870, 909 (N.D. Iowa 2008) (finding "a prima facie case for the class" was established through common evidence where an employer's "compensation system cannot account for . . . employees['] need to" perform donning and doffing activities that must be compensated under the FLSA). See also Garner v. Butterball, LLC, 2012 WL 570000 *5 (E.D.Ark. 2012).

Finally, cash disbursement journals, also common across the three classes, will be used to establish breach of the uniform contracts' requirement that subsistence payments be made during both outbound and return travel. See Ex. I.

The third element of a prima facie case for breach of contract, damages which flow from the breach, are self evident considering the nature of the contracts and will require virtually no proof, common or otherwise, beyond proof of the breach itself. "Indeed, once the matter of liability has been resolved, the question of damages almost answers itself." Norris-Wilson v.

Delta-T Group, Inc., 270 F.R.D. 596, 608-609 (S.D. Cal. 2010). Specifically, breach of the uniform contracts' obligation to pay Plaintiffs and class members a specific wage rate (and, where applicable, overtime) once established by common evidence as discussed above, will naturally give rise to expectation damages: The difference between what Plaintiffs and class members would have received had they been afforded payment at their contractual hourly and overtime rates minus the amounts they were paid from Defendants. Subsistence and travel costs owed to Plaintiffs and class members as a result of Defendants' policy of violating the uniform contracts also represent expectation damages. Therefore, the presence of damages, the final element of a prima facie case for breach of contract, will be established by common evidence.

While the calculation of damages under this basic formula would require the application of rudimentary mathematics on an individual basis, "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1437 (2013) (Ginsburg, J. and Bryer, J. dissenting). Importantly, the fast-evolving jurisprudence of Rule 23(b)(3) demonstrates calculation of damages on the above basis does not preclude a finding of predominance. Although any "mode" used in calculating damages must establish that those damages "are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" (Comcast, 133 S.Ct. at 1433), "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Industries, Inc., 2013 WL 2306567, *3 (9th Cir. 2013) (decided approximately two months after Comcast on May 28, 2013). See also Garner, 2012 WL 570000 at *5 (noting that "the cases are legion in which courts have rejected arguments that differences in damages among the class members should preclude classification.") (quoting Blihovde v. St. Croix Cnty., 219 F.R.D. 607, 621 (W.D.Wis. 2003)).

25

"In <u>Comcast</u>, the Supreme Court reversed an order granting class certification because the plaintiffs relied on a regression model that 'did not isolate damages resulting from any one theory of antitrust impact.'" <u>Leyva</u>, 2013 WL 2306567 at *3 (quoting <u>Comcast</u>, 133 S.Ct. at 1431). "The Court concluded that 'a model purporting to serve as evidence of damages in **this** class action must measure only those damages attributable to that theory.'" <u>Id.</u> (quoting <u>Comcast</u>, 113 S.Ct. at 1433) (emphasis added).

"It is true that" Plaintiffs "must be able to show that their damages stemmed from the [D]efendant[]s['] actions that created the legal liability." <u>Id.</u> at *3. However, as in <u>Leyva</u> and "unlike in <u>Comcast</u>, if putative class members prove . . . liability, damages will be calculated based on the wages each employee lost due to . . . unlawful practices." <u>Id.</u> Thus, the reasoning in <u>Comcast</u> regarding use of a damages "model[,]" whatever the appropriateness in an antitrust context, is inapposite to "**this** class action[,]" which involves damages in the wage and hour context and payment of simple travel and subsistence costs that can be measured on a classwide basis using primary-school math. <u>Comcast</u>, 133 S.Ct. at 1431 (emphasis added).

"Indeed, the Supreme Court clarified in <u>Dukes</u> that 'individualized monetary claims belong in Rule 23(b)(3).'" <u>Leyva</u>, 2013 WL 2306567 at *3 (quoting <u>Dukes</u>, 131 S.Ct. at 2558) (emphasis added). "Thus, the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." <u>Id.</u> Because "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated[,]" an individualized calculation of damages does not control the predominance analysis of Rule 23(b)(3) in this case. <u>See also</u> <u>Salas-Mateo v. Ochoa</u>, 2004 WL 1824124, *3 (S.D. Fla. 2004) ("While the amount of back wages owing to each individual member may differentiate, the basis for calculating those wages – namely the terms of the [H-2A contract] clearance orders – remains common amongst all the

members.").

Under the limited-but-rigorous Rule 23(b)(3) inquiry, Plaintiffs have established that common evidence will suffice to establish a prima facie case for the class and have therefore shown that common questions predominate. See Luiken, 705 F.3d at 377.

*B. A class action is superior to other methods of adjudication.*

To satisfy Rule 23(b)(3), Plaintiffs must also demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "The matters pertinent to these findings include (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

With respect to the first factor, it is extremely unlikely that individual class members have any interest in instituting or controlling their own individual actions. In fact, most of the class members, for obvious reasons, would probably be unable to bring their own actions. This is especially true given the class members' locations around the world, their near-total unfamiliarity with the American legal system, and the relatively small amount of individual recovery. Such reasons have supported findings that a class action is superior to other available methods of adjudication in cases involving transitory agricultural workers from foreign countries. See, e.g., Rodriguez v. Carlson, 166 F.R.D. 465, 480 (E.D. Wash. 1996); Leyva, 125 F.R.D. at 518; Haywood, 109 F.R.D. at 592.

The second criteria is inapplicable given the facts of this case, as no other litigation concerning this controversy has been commenced by members of the class. The third factor is

satisfied in this case, as it is desirable to have this litigation in this forum. The Defendants are located and maintain their business offices and residences in this district, and the records and other evidence pertaining to the class members' employment with the Defendants are also located in this district. Finally, requiring separate suits would likely result in far greater management difficulty than proceeding in the form of a class action. See Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978) (finding superiority under Rule 23(b)(3) where "[n]umerous individual actions would be expensive and time-consuming and could create the danger of conflicting decisions as to persons similarly situated.").

## CONCLUSION

The Court should respectfully grant the Plaintiffs' Motion for Class Certification and permit this matter to proceed as a class action with respect to the breach of contract claim set forth in the fourth claim for relief in Plaintiffs' Amended Complaint.

Respectfully submitted this 3rd day of July, 2013.

By:

Mac Schneider
ND ID # 06476
Schneider, Schneider, & Schneider
815 Third Avenue South
Fargo, ND 58103
(701) 235-4481